DREW, J.
laThe apportionment of 100% fault against the City of Shreveport and the amount of the general damages are the issues in the City’s appeal in this trip and fall case. A teacher and assistant softball coach for Shreveport’s Turner Middle School, Heather Matlock fell as she was approaching the gate to a set of baseball fields at Cargill Park on October 24, 2005. While carrying softball equipment as she spoke with her team and a hearing impaired volunteer coach about the game, Matlock twisted her ankle in a hole or depression in the sidewalk and fell to her hands and knees.
In severe pain, Matlock went by ambulance to the emergency room at Willis-Knighton Pierremont Hospital. Personnel there x-rayed, treated, and released Mat-lock, who went home with an air splint for her left ankle, crutches and pain medication. In addition, she was instructed to follow up with her orthopedic doctor, who diagnosed an avulsion fracture[1] of her left ankle and treated her with a boot cast and medication. The orthopedist also referred Matlock to physical therapy to assist in her recovery.
Matlock alleged that the fall injured her left ankle and foot, both knees and her right hand and forearm. Following the bench trial, the trial court rejected a portion of plaintiffs demands, finding that Matlock failed to present sufficient evidence that her right knee problems and 2008 anterior cruciate ligament surgery were caused by the 2005 fall. After determining that the City was 100% at fault for the defective sidewalk, the trial court awarded Matlock special damages of $4,896.79, lost wages of $1,078.79, and general damages at $75,000.00.
*1134 IsThe City of Shreveport appealed the judgment assessing it with 100% of the fault for plaintiffs fall on a sidewalk defect. The City asserted the depression was obvious and easily avoidable had Mat-lock been looking where she was walking. Additionally, the City argued that the general damages were excessive. For the following reasons, the judgment is amended and, as amended, affirmed.
TESTIMONY AT TRIAL

Milton A. McGraw

A retired Shreveport Parks and Recreation (SPAR) employee, McGraw testified he was Youth Sports Coordinator on the day of Matlock’s fall and was Interim Division Manager for SPAR when deposed in this matter in June 2007. McGraw stated that, to his knowledge, there was not a policy or procedure in place to inspect the parks at the time of the accident. While formal inspections were not conducted, repairs were made when the ball field crews reported any problem to their supervisor. The maintenance department then made any repairs.
The hole or depression in the sidewalk was at the entrance to ballparks six through ten. Sometime after Matlock’s mishap, the sidewalk was repaired for approximately $50 with a bag of Quikrete or asphalt. McGraw estimated 5,000 to 10,-000 people a year used that particular entrance at Cargill. He had no knowledge of anyone else falling at that location. McGraw did not consider the depression unreasonably dangerous because anyone paying reasonable attention would recognize the defect. He acknowledged that the depression as shown in the photos in evidence had probably been there several years.

Heather Matlock McFarland,

[2]

 plaintiff

14Approximately 15 girls from grades six, seven and eight at Turner Middle School comprised the softball team, which traveled by school bus to the park. After exiting the bus and meeting their volunteer assistant coach at the parking lot, the students and coaches all carried equipment bags as they walked on the sidewalk from the parking lot toward the gate to their assigned ball field. Surrounded by the students, Matlock said she talked to the girls and encouraged them about the upcoming game. Matlock stated her left ankle rolled out from under her in the hole in front of the entrance. She twisted toward the left and hit her right knee on the ground and the back of her head on a car parked near the pathway.
Matlock’s left ankle was in severe pain and swollen. Her foot was purple from the bottom of her ankle bone into her toes. She could not move her left foot. Matlock was very upset and in pain in the ambulance, so emergency room personnel gave her something to calm her. Her right knee had a gash in the bend, which swelled and created a bump on the top part of her kneecap. The doctor did not want to stitch it because it was in the bend. Her hands were scratched up. X-rays revealed no fractures and Matlock was discharged with an air splint, crutches, and pain medication along with instructions to see her orthopedic doctor.
Concerning her medical history, Matlock testified she injured her right knee in 1994 but continued to be active until she injured her knee in 2003 playing softball. Dr. Gordon Mead operated on her right knee in 2003 to repair a torn meniscus. Mat-lock acknowledged she had right knee instability and a problem with right anterior cruciate ligament in 2003. Thereafter, she *1135 wore a brace for sporting events and was not troubled by her knee when she played sports.
|fiOn the day following her fall, Matlock saw Dr. Mead, who observed marked swelling in her left ankle along with abrasions on both hands and her right forearm. Dr. Mead placed her in a CAM walker (removable brace or cast to stabilize the ankle and aid healing). On a subsequent visit, x-rays revealed an avulsion fracture. Dr. Mead also referred Matlock to physical therapy for her ankle injury. She complained about right knee on her third visit. Unable to kneel or to put weight on her left ankle after the fall, Matlock described bruises on her hands and blisters under her arms resulting from the crutches.
.Matlock saw Dr. Mead from October 2005 until January 4, 2006, when he discharged her to return to work at her request. She was never able to return to coaching. Matlock stated she received worker’s compensation benefits from the time of her fall in October 2005 until her discharge in January 2006.
Matlock characterized the physical therapy sessions for her ankle as painful and testified the therapist rotated her ankle so painfully that she screamed. She followed his instructions to do exercises at home with rubber bands he provided. Following completion of her therapy sessions, Mat-lock requested more therapy but testified she was denied by the comp carrier. In his deposition, Dr. Mead corroborated that Matlock had requested more physical therapy sessions.
In contrast to the physical therapist, whose testimony is noted below, Matlock said she attended every 2005 therapy session except one, which she rescheduled due to vomiting. Matlock was unaware, until her attorney informed her, that the therapist had discharged her for noncompliance. | ñMatlock emphatically denied failing to make effort and exaggerating pain complaints.
When she returned to teaching after being discharged at her own request in early January 2006, Matlock’s principal accommodated her weakened and painful ankle condition by assigning her to tutoring small groups of 4th graders. This eliminated her working with very physical 6th graders with whom she was at risk of being knocked down. This assignment also allowed Matlock to sit while instructing her students. Her ankle continued to swell and hurt, particularly at the end of the day or after periods of significant activity.
Stating she had been very athletic all her life, she began sports as a young child and played team sports in high school, college and after college. Since the fall, she can no longer participate in team sports or biking. She also is unable to get down on the floor with her students, something she liked to do before her fall.

Cheyenne Rogers

Matlock’s roommate and volunteer assistant coach, Rogers met the school bus transporting the team at the park. She walked downhill on the sidewalk from the parking lot to the gate with Matlock and their players. Like Matlock, Rogers stated she was carrying a large equipment bag. She saw Matlock fall when she turned her ankle in the hole in the sidewalk. Rogers testified that because she is deaf, she could not phone 911 but another person did so.
She met Matlock at the hospital where Matlock’s primary complaints concerned the significant pain in her left ankle for which she was given an |7air splint, crutches and pain medicine. With instructions to elevate the ankle and use ice, Matlock was discharged with the admonition to see her own doctor. Matlock also had á gash on *1136 her knee. The women later discovered dried blood from a cut on Matlock’s head.
With assistance of a neighbor, Rogers helped Matlock up the stairs and into their apartment, where she had a difficult first night due to her pain. In the days after the fall, Rogers helped Matlock with almost all aspects of her personal care because Matlock was unable to get in and out of the bath, to cook or do laundry. Her activities were very limited and she could no longer play ball or bike.
Rogers took Matlock to all her physical therapy sessions and assisted at the sessions. The therapist taught Matlock how to stretch and rotate the ankle and instructed Rogers in how to give ankle massages and to assist Matlock in doing exercise with large rubber bands. The therapy was very tough and painful but Matlock followed the therapist’s instructions including alternating hot and cold soaks and putting weight on the ankle to strengthen it. On cross-examination, Rogers stated that Matlock went to all the therapy sessions she was supposed to attend, some eight or ten. Rogers knew that because she made all the appointments and transported Matlock. Rogers did not know how many sessions were prescribed but disagreed that Matlock was discharged for “no shows.”
By January of 2006, Matlock still had ankle weakness and was cautious for fear of re-injury. She could not climb ladders or do weight-bearing activities. Matlock returned to teaching but could not resume coaching. From January of 2006 until July of 2008, Rogers assisted Matlock a couple of times a week with massages to keep her ankle from stiffening Rand with exercises. At the time of trial, Rogers testified that Matlock could not squat without help and waddled when she walked, since her left ankle and her right knee remained weak.
Before the 2005 fall, Matlock was very active in basketball and softball both as a coach and as a member of various teams, including a female football league. In addition, she was an avid bike rider and bowler. At trial, Matlock was limited to walking on smooth surfaces but could do nothing strenuous and no contact sports, since she feared being re-injured. Rogers explained that Matlock saw no doctors between January 2006 and July 2008 because she did not have health insurance during that period.

Lacy Williams

A team member and 7th grader on the day of the accident, Williams testified that after being dropped off by the school bus, the team and their coaches walked to the field on the sidewalk. Although near, she did not recall where she was in relation to Matlock but heard her fall and say her ankle was hurt. She recalled that Matlock did not return as coach that year. She also felt that Matlock, who was carrying equipment, could have seen the hole had she been looking.

Rob Kenney

The physical therapist to whom Dr. Mead referred Matlock for treatment testified by deposition. At her initial visit, Matlock wore the CAM walker and used crutches. The evaluation revealed a significant left ankle sprain with swelling and limited range of motion. In addition, Mat-lock was 19apprehensive about moving the joint. Matlock reported her pain to be 8 to 10 on a 10-point scale.
Kenny stated he recommended 3 sessions a week for 4 to 6 weeks and set both short- and long-term goals for the therapy. While Matlock met the short-term goals, she stopped coming after 7 sessions in November.
Kenny ultimately discharged her for noncompliance by missing sessions and *1137 noted in his report to Dr. Mead that Mat-lock exhibited poor effort secondary to exaggerated complaints of pain which he described as symptom magnification. Explaining that “by no means implies intent,” Kenny said that physical, cultural and psychological factors and other little understood reasons can result in symptom magnification which can mean that the results of therapy are less predicable and can lead to incomplete recovery. Because Matlock was sensitive to superficial touch, he concluded she had symptom magnification. However, he also did not dispute the existence of her injury. During the course of her treatment, she wore the CAM walker on every visit but by the last visit was using only the CAM walker without other aids such as crutches or cane.

Dr. Gordon Mead

In his deposition, Dr. Mead stated he initially saw Matlock on October 25, 2005, and treated her until he discharged her to return to work at her request on January 4, 2006. At the first visit, Matlock had marked swelling in her ankle along with abrasions on her knees and right forearm. He ordered the CAM walker for Matlock to stabilize the ankle and aid healing. Subsequently, she developed problems with her right knee which he stated were external and not within the joint itself. Ail of his treatment was related to the October 24, 2005, fall and he saw no indication of exaggerated |insymptoms, noting that the recovery progress was reasonable. Dr. Mead characterized this sprain as a 6 to 7 with 10 being the worst sprain. The doctor also noted that Matlock requested additional physical therapy sessions.
REASONS FOR JUDGMENT
The district court issued written reasons, concluding as follows with respect to liability:
1. The hole was at least 1½ inches deep, 51 inches long and 18 inches wide (P. exh. 3). The hole is a marked, abrupt change in the walkway, which is the only entrance into Cargill ballpark. There was no warning or marking of this change in elevation.
2. The hole was a defective condition which presented an unreasonable risk of harm, the cost of which to repair was extremely inexpensive and feasible.
3. Matlock was acting as a reasonable person at the time she fell. It was reasonably foreseeable that a coach would carry the team’s equipment, would talk to her team while approaching the field, and would talk to her colleague while approaching the field.
The trial court observed that the law requires a person to act reasonably and prudently, and not to walk as if trudging through a minefield. Additionally, the assistant coach is hearing-impaired, which required Matlock to maintain eye and face contact while they walked and talked. The City through its agent had actual knowledge of the sidewalk depression at least a year before the accident, and a reasonable opportunity to remedy the defect, but failed to do so. The ankle injury was caused by the fall at Cargill. Therefore, the trial court found the City liable for the accident and concluded it was inappropriate to assess any fault to Matlock.
Matlock’s ankle injury, as avulsion fracture, was painful and debilitating. The doctor described it as a 6-7 on a pain scale of 10 and |nprescribed pain medicine and physical therapy. For two months, Mat-lock used crutches and a CAM walker and needed help with daily activities. Dr. Mead testified Matlock’s 2005-2006 treat *1138 ment by him was related to the fall at Cargill.
Noting that Matlock and the physical therapist had a difficult relationship, the trial court observed the therapy treatment was painful. Although the therapist stated Matlock was noncompliant, the trial court pointed out the therapy treatment bill totaled $1,880.69. Observing that Matlock had a good relationship with a subsequent therapist for an unrelated 2008 knee surgery, the trial court rejected the assertion that Matlock failed to mitigate her damages.
The trial court also relied upon the functional capacity evaluation placed into evidence. That physical therapist found Mat-lock had decreased left ankle strength and range of motion, with painful palpation of the left lateral ankle. Finding she could continue teaching, the therapist found that Matlock reported a very unstable left ankle that made a return to the classroom more likely than a return to coaching.
The trial court accepted that Matlock had pain and difficulty toward the end of her teaching day. Previously active and athletic, Matlock was encumbered with a left ankle injury that amounted to a permanent functional disability.
Judge Crichton awarded special damages of $4,896.79 and lost wages of $1,078.79. Additionally, the trial court set general damages at $75,000. Finding insufficient proof that Matlock’s knee injury and subsequent 2008 surgery on her ACL resulted from her fall at Cargill, Judge Crichton decided that Matlock had not carried her burden of proof on that aspect of her claim. 112The denial of Matlock’s claim for the ACL injury and other injuries is not at issue in this appeal. Likewise, the special damages are not before this court.
DISCUSSION
The presence of the significant pothole in the sidewalk was undisputed. Matlock stepped into the hole, inverted her ankle, twisted it, and fell, landing on her hands and knees. Photographs and testimony in the record established, and the trial court found, that the hole was at least 1½ inches deep, 51 inches long and 18 inches wide. The trial court observed that the hole was a marked, abrupt change in the walkway and located at the entrance into a set of ball fields at Cargill Park. There was no warning or marking of this change in elevation.
According to the City, this particular “depression” in the sidewalk cannot be considered as presenting an unreasonable risk of harm, because this dangerous condition was patently obvious and easily avoidable. Because Matlock failed to exercise reasonable care, she was responsible for her fall and her action against the City should have been dismissed by the trial court.
Citing Boddie v. State, 27,313 (La.App.2d Cir.9/27/95), 661 So.2d 617, the City acknowledged its duty to maintain the sidewalk in a reasonably safe condition, but contended that Matlock had a duty to see what should have been seen. While a pedestrian is not required to look for hidden dangers, she must observe her course to see if her pathway is clear. A pedestrian is not expected to look down constantly while walking, but must see obstructions which would be discovered by a reasonably prudent person. Just because a pedestrian falls does not elevate a condition to an | ^unreasonably dangerous defect. The imperfection must present an unreasonable risk of harm. Boddie, supra.
The City’s reliance upon Boddie, supra, is misplaced. The court assessed the state with 100% of the fault in Boddie’s fall. While there was evidence of other persons *1139 having fallen on the somewhat elevated metal drain cover on the sidewalk on the grounds of the State Office Building in Shreveport, Boddie’s mishap occurred during dry conditions with nothing obstructing her view and no indications she was being hasty. The metal drain cover was elevated enough to be hazardous and was not so apparent as to be easily observable. The state had actual notice of the condition and failed to remedy it. Although the state argued that the clearly visible drain cover was a somewhat different color from the sidewalk and that thousands of people traversed the sidewalk annually without mishap or injury, the court found that the drain cover was an unreasonably dangerous defect and that Boddie was not at fault. The court assessed all the fault on the state. Boddie, supra.
Matlock fell on what several witnesses described as a beautiful day which was dry. Personnel for the City acknowledged they knew about the hole in the sidewalk for at least a year, although no action was taken to remedy it. After Matlock’s fall, the defect was repaired with a sack of Quikrete or asphalt at a cost estimated by McGraw to be approximately $50.
This broken sidewalk provided access to a set of the ball fields at the park. It was certainly foreseeable and reasonable to anticipate that a coach arriving with her team would carry equipment and talk to her charges and fellow coaches. As noted by the trial court, Matlock’s circumstances were made more complex by the fact that the volunteer assistant coach described | uherself as deaf, which apparently required that the women maintain eye contact and face to face interaction as they spoke to one another.

Allocation of Fault

In Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607, a driver ran off the road onto a rutted, very narrow shoulder which dropped off into a swamp. When she reentered the highway, the driver lost control and struck another car. The court resolved a split in the appellate circuits and set out the correct procedure for an appellate court to review and to adjust, if necessary, the allocation of percentages of fault. Noting the large amount of uncertainty in apportioning fault, the appellate court must first make the ultimate judgment call as to whether a given trier of fact abused its great discretion in assessing fault. Coco v. Winston Industries, 341 So.2d 332 (La.1977).
Only if its review of the record shows that the trier of fact abused its great discretion may an appellate court adjust the allocation of fault. The reallocation can only be to the extent of lowering it (or raising it) to the highest (or lowest) point reasonably within the discretion afforded the court. It is never appropriate for an appellate court to simply decide what it considers to be an appropriate award based upon the evidence. Clement v. Frey, supra.
The trier of fact is owed some deference in allocating the percentages of fault, which is a factual determination. As with determining quantum, the trier of fact has the benefit of witnessing the entire trial and reviewing the evidence first hand. After finding the apportionment of fault is “clearly wrong,” the appellate court may lower or raise it to the highest or lowest | ispoint respectively while still within the trial court’s discretion. Clement v. Frey, supra.
In Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985), are factors to guide appellate court’s assessment of the highest and lowest reasonable percentages of fault which could have been allocated by the trier of fact:
*1140 In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct result from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff and considerations in determining the relative fault of the parties. Clement v. Frey, 666 So.2d at. p. 611.
In Clement, supra, the supreme court agreed with the appellate court that the trial court was clearly wrong in assessing 95% of the fault to DOTD due to the dangerous condition of the highway and the very narrow, rutted shoulder and only 5% to the driver who lost control of her vehicle and struck another driver. However, the supreme court reversed the appellate court’s 50/50 split of fault after referring to the deference that must be given to the trier of fact. Applying the foregoing analysis to the facts, the supreme court raised and lowered the allocations of fault to the highest and lowest points within the discretion of the trier of fact, i.e., 75% to DOTD and 25% to the driver.
In the present dispute, we agree with the trial court’s finding that the large pothole-type break in the sidewalk was a dangerous defect constituting an unreasonable risk of harm. The “depression” (the City’s term) was [^located near the entrance via a gate to five ball fields at the park. While visible to someone looking down while walking, it was foreseeable and reasonable that persons approaching the gate would be (1) accompanied by groups of children requiring their attention and (2) burdened with significant amounts of equipment for use in playing or practicing ballgames on the fields.
Had this court been sitting as the trier of fact, our review of the evidence would have resulted in a significantly different allocation of fault than the 100% liability assessed to the City of Shreveport. Although our analysis indicates both the City and Matlock must share in the fault assessment, an appellate court must not simply decide what it considers to be an appropriate award based upon the evidence. The trial court heard the witnesses first hand and reviewed all the evidence. This court owes deference to the trial court’s factual determination of fault allocation and may raise or lower the amounts only to the highest and lowest amounts within its discretion. Clement, supra.
Our first finding is that the learned trial court abused its discretion in assessing Matlock with no responsibility for her fall. Clearly, Matlock was familiar with this location, having visited that area many times without mishap as a player and a coach. Likewise, no direct evidence of others falling at the location was presented. As one of Matlock’s players testified, Matlock could have seen the hole had she been looking.
Nevertheless, Matlock was proceeding reasonably under the circumstances. She was talking with her companions, one of whom was hearing impaired, while carrying equipment. She did not see the dangerous hole in which she rolled her ankle and fell. Matlock was not responsible for 117the unsafe condition of the sidewalk. The City was responsible for maintaining the sidewalk in a safe condition. The City had notice of the large hole for at least a *1141 year and probably much longer. The City failed to make the simple and inexpensive repair until sometime after Matlock’s fall.
The assessment of 100% fault to the City was clearly wrong because Mat-lock also had some responsibility for her fall and resulting injury. Computing a reasonable high/low division of fault and giving deference to the trial court’s factual determination, we hold that the City was more responsible for the fall, but no reasonable trier of fact could have found the City more than 75% at fault.
While Matlock was behaving in a reasonable and foreseeable manner when she fell, she could have seen the broken area had she been looking down at that particular time. We accordingly find that Mat-lock was no less than 25% responsible for tripping and falling. It was unreasonable for the trier of fact to have assigned less than 25% of the fault to Matlock.

Quantum

In Howard v. Union Carbide Corp., 2009-2750 (La.10/19/10), 50 So.3d 1251, the court cited the well-settled principle that vast discretion is accorded to the trier of fact in fixing general damage awards. La. C.C. art. 2324.1. Because this discretion is so great, an appellate court should rarely disturb an award of general damages. In reviewing a general damage award, the role of the appellate court is not to determine what it considers to be an appropriate award, but to review the trier of fact’s exercise of discretion.
Like the appellate review of an allocation of fault, the initial inquiry in evaluating a general damages award is whether the trier of fact abused its discretion. While reasonable persons frequently can disagree with the 118quantum of general damages, the monetary award must have a reasonable relationship to the elements of proven damages. Only if the appellate court finds that the trier of fact has abused its “much discretion” in setting the quantum is a resort to prior damages awards appropriate. The reviewing court may adjust the quantum only to highest or lowest point which is reasonably within that discretion. Howard, supra.
On appeal, the City of Shreveport complained that the trial court abused its great discretion in awarding Matlock general damages of $75,000. If the court determined Matlock was entitled to general damages, the City suggested that $15,000 was an appropriate amount, since Matlock required no surgery and sustained no permanent injury.
Following her accident, Matlock was in substantial pain and required assistance for basic self-care. Although she had no major fracture or dislocation in her ankle, the avulsion fracture caused major discomfort as a bad sprain. It is undisputed that treatment for a sprain and an avulsion fracture are the same.
The evidence concerning Matlock’s physical therapy with therapist, Rob Kenny, is very contradictory. Given the diametrically opposed versions about how the physical therapy was terminated, one can only surmise a major breakdown in communication between the physical therapist and his staff with Matlock and her roommate must have occurred. The trial court found Matlock and her roommate credible and rejected the suggestions that Matlock failed to mitigate her damages by lack of participation in her therapy.
The therapist stated that Matlock met her short-term therapy goals but did not return for all the therapy sessions recommended which prolonged her | ^recovery. Matlock and her roommate stated she attended all her therapy sessions except one due to illness. Dr. Mead corroborated that Matlock requested more therapy after *1142 the conclusion of the approved therapy-sessions.
Administered 2⅜ years post-accident, the functional capacity evaluation by Physical Therapist Larry Larsen and placed into evidence revealed that her injury caused instability and disability in her left anide. The therapist commented that Matlock’s “very unstable left ankle” made a return to classroom teaching far more likely than a return to coaching because of the need for physical agility and athletic technique required to coach. The report recommended further rehabilitation of the left ankle to increase stability and suggested future surgical intervention to increase stability was likely. The overall conclusion of the test was that Matlock had a moderate disability level.
The record is filled with explanations of the major impact that the injury had on Matlock’s life. At Matlock’s own request, she was discharged from Dr. Mead’s medical care and released to return to teaching in early January 2006. Due to danger of re-injury and pain and swelling at the end of a teaching day, Matlock’s principal accommodated her situation by assigning her to teach small groups of young children while seated. Up until the time of trial, she continued to have pain and swelling and worked at home and with Rogers on exercises and massages to prevent ankle stiffness.
Very athletic from a young age, Matlock participated as a player and coach in many team sports and was very physically active in other leisure activities. The weakness and pain in her ankle make a return to that active Lplifestyle impossible for her. Matlock’s fall permanently altered and worsened the lifestyle she enjoyed prior to her mishap.
Recognizing the trial court’s great discretion in setting general damages and the frequency with which reasonable people can disagree over quantum, we find that, in this matter, the trial court exceeded the amount which reflected a reasonable relationship to the elements of proven damages. Based on its first-hand observation of the witnesses and examination of the evidence, the trial court’s determination is entitled to great deference and may be reduced only to the highest reasonable amount.
Since this young woman’s life has been unquestionably altered as a result of her fall, we amend the general damages award to $50,000, subject to the reduction of 25% of the fault attributable to her in the fall. While very generous, this award is reasonably supported by the evidence demonstrating the continuing impact of her injury and resulting disability on her activities continuing at the time of the trial.
CONCLUSION
The judgment of the trial court is amended to reduce the allocation of fault assessed to the City of Shreveport to 75% and to assess Heather Matlock McFarland, plaintiff, with 25% of the fault in the cause of this fall. In addition, the award for general damages is reduced from $75,000 to $50,000 subject to a 25% reduction reflecting the fault attributable to the plaintiff. Costs of the appellate court in the amount of $171.50 are assessed 75% to the City of Shreveport and 25% to Heather Matlock McFarland.
DECREE
The judgment of the trial court is AMENDED, AND, AS AMENDED, AFFIRMED.
STEWART, J., concurs with written reasons.

. An avulsion fracture occurs when damage to a tendon or ligament pulls off a piece of the bone. The treatment of an avulsion fracture is identical to the treatment for a sprained ankle.

. The plaintiff married after the accident and before the trial.